IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAVID M. SMITH, | CASE NO. 5:20-CV-00438-JPC |
| Petitioner, | JUDGE J. PHILIP CALABRESE |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN LASHANN EPPINGER, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

On February 26, 2020, Petitioner David M. Smith, pro se, filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF #1). Respondent, Lashann Eppinger, as Warden of Trumbull Correctional Institution (hereinafter, the State), filed an Answer and Return of Writ on July 21, 2020 (ECF #7) and a Supplement to Return of Writ on August 11, 2020 (ECF #10). Mr. Smith filed a Traverse to Return of Writ (ECF #20) on December 21, 2020. On March 25, 2020, the matter was referred to a Magistrate Judge for the preparation of a Report and Recommendation pursuant to Local Civil Rule 72.2 (non-document entry of Mar. 25, 2020), and was reassigned to me on May 26, 2021, (non-document entry of May 26, 2021).

For the reasons discussed below, I recommend the Petition be **DISMISSED** in its entirety. I also recommend the District Court **DENY** Mr. Smith a certificate of appealability (COA) for Grounds One, Three, Four, Five, Six, and Seven, and **GRANT** a COA as to Ground Two.

1

FACTUAL BACKGROUND

For purposes of habeas corpus review of state court decisions, a state court's findings of fact are presumed correct and can be contravened only if the habeas petitioner shows, by clear and convincing evidence, that the state court made erroneous factual findings. 28 U.S.C. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings a state court of appeals makes based on the state trial court record. *Mitzel*, 267 F.3d at 530. In its opinion affirming Mr. Smith's convictions, Ohio's Eleventh District Court of Appeals summarized the underlying facts as follows:

{¶ 55} At trial, Tolliver testified that on October 16, 2015, she was texting Smith back and forth. Smith wanted to buy crack cocaine, but she only had heroin. Tolliver knew Smith for about two weeks. He had previously driven her to Cleveland in exchange for $20 worth of crack cocaine.

{¶ 56} Tolliver said her connection from Cleveland did not deliver her drug supply, so Smith agreed to drive her there that day. She had about $500 on her to make the buy.

{¶ 57} Smith agreed to pick her up after his job interview. Tolliver recalls opening her front door for him and going to get her shoes when she "felt a hit." She said Smith hit her with a hammer and she fell to her knees. He hit her multiple times in the head, and had she not regained consciousness and exited her home, she would have died.

{¶ 58} Tolliver explained that she remembered police visiting her in the hospital, but said she could not recall them or what she said to them. She testified that she knew who had done this to her before she even woke up from her coma, but she wanted to know if the police knew who attacked her. Tolliver also said that she wanted to know how the police figured out that Smith had done this to her. She explained that she wanted to "settle" the matter on her own.

{¶ 59} Tolliver also stated that even though she was already facing seven felony drug trafficking charges, which her mother knew about, she did not want to admit in front of her mother that she was still selling drugs. She also did not want to disclose her continued illegal activity to the police. Tolliver ultimately pleaded guilty to two felony counts of trafficking and received probation.

2

{¶ 60} Terri McDaniel, the manager of the mobile home park and Tolliver's neighbor, testified that on the morning of Tolliver's attack, he saw three cars near her trailer at approximately 10:45 a.m. No one was in the vehicles when he first saw them. McDaniel saw a woman in her fifties exit Tolliver's trailer and get into the passenger's side of a light brown car. Another woman with blonde hair was driving. He watched this car leave and go to the Walmart across the street. McDaniel then watched a black man leave Tolliver's trailer and get into an older black car. He also recalls a white male exiting her trailer and getting into a white car. McDaniel followed these two cars into downtown Kent on his way to his office. He said he saw each of these individuals exit her trailer separately.

{¶ 61} Lisa Frame testified that she and Smith were friends and that they used illegal drugs together. They were together approximately three to four days a week. She recalls him coming to her apartment one day in October 2015 when she was "dope sick" from heroin withdrawal because she had no drugs or money to buy any. Smith told Frame he had an idea to sell a gun to a friend so he could buy crack for himself and heroin for Frame. Frame drove Smith in her older black car to the mobile home park where Tolliver lived, and Smith had his gun wrapped in a t-shirt or a windbreaker. Frame dropped him off and then drove three or four laps around the mobile home park while waiting for him. She waited for about 15-17 minutes. Frame did not know Tolliver and does not remember which trailer Smith approached that day. When he returned to Frame's car, she did not think he sold his gun because he still had something wrapped up in the same t-shirt or windbreaker, and Smith told her it was a "no-go," meaning he did not sell it. He returned to her car wearing the same clothes and did not appear disheveled.

{¶ 62} Later that same day, Frame recalls Smith having a lot of heroin, about eight grams. She knows he did not have any heroin earlier that day because he would have given her some since she was so dope sick. She has no idea where Smith got this heroin.

{¶ 63} Sherry Thorp also testified for the state. Thorp is a heroin and cocaine addict who has struggled with addiction for years. She is friends with Tolliver, and Tolliver sold her drugs on the morning of her attack. Thorp's sister drove her in her bronze colored car to see Tolliver at about 10 a.m. Thorp bought $20 worth of heroin and was there about five minutes. Thorp recalls Tolliver saying that she did not have any cocaine, but that she would have some later that day. She explained that Tolliver would have had a lot of money on her to purchase heroin later that day. Thorp was unsure if Tolliver's suppliers from Cleveland were delivering the drugs or if Tolliver was getting a ride to Cleveland to make the purchase.

{¶ 64} Tolliver's neighbor, Daniel Greathouse, testified that on the day of the attack he was sleeping in his recliner. He woke up to his dog barking and a female screaming. He got up and looked out his window and thought he saw Tolliver's

daughter in his yard, but then realized it was Tolliver. He watched her walk to the trailer across the street. He described Tolliver as stumbling like she was drunk and remembers seeing her pockets turned inside out. He got dressed and went across the street and waited there until the ambulance arrived.

{¶ 65} Lieutenant Johnson arrived at Tolliver's trailer approximately 15 minutes after the 911 call. After confirming there were no victims or suspects inside, he secured the trailer. The interior of the trailer was covered with blood, there was blood all over the bathroom sink, and a hammer was found in the kitchen.

{¶ 66} Tolliver's cell phone was missing. It was not on her and it was not found at the scene. Officers found no money, drugs, or jewelry in her trailer or on Tolliver. There was no sign of a forced entry.

{¶ 67} Johnson confirmed that Tolliver was texting someone with a 419 area code very frequently before the assault, but that the individual using this number did not call or text her after the attack. Tolliver's last phone call with the individual using the 419 number was at 11:21 a.m. This was a completed call that lasted from two-to-sixteen seconds. There were 85 contacts between Tolliver's phone and this 419 number during the 24 hours before the attack.

{¶ 68} Before learning that this 419 phone number was associated with David Smith, Johnson learned from BCI that one of the DNA swabs from Tolliver's bathroom tested positive as preliminarily associated with Smith. Johnson went to Smith's apartment, who voluntarily spoke with him. Smith told Johnson he had heard about the attack, and he denied ever being inside Tolliver's home. Smith confirmed his phone number was the 419 number that had numerous contacts with Tolliver's phone during the 24 hours before the attack.

{¶ 69} Johnson also obtained a copy of Smith's employment application submitted on the day of Tolliver's attack with his fiancée's employer. Smith provided this same 419 phone number as his contact number.

{¶ 70} Johnson relayed the information he received from Tolliver's and Smith's cell phone carriers at trial. Smith's phone carrier's records showed that on October 16, 2015, between 11:46 a.m. and 11:52 a.m., his cell phone number registered on a cell phone tower located on the same road where Tolliver's attack occurred and that was 1,738 feet from her trailer.

{¶ 71} Johnson explained that Tolliver was reluctant in helping law enforcement because she was a drug trafficker, who was concerned about repercussions from being a snitch. She was also out on bond on her trafficking case at the time of the attack and was still selling.

{¶ 72} Tolliver's lawyer contacted Johnson after Tolliver was out of rehabilitation and after she was sentenced for her trafficking offenses. Tolliver was 100 percent certain that Smith was the person who attacked her with a hammer.

{¶ 73} Johnson also relayed that Tolliver's phone records showed that she had a two-minute phone call at 11:31 a.m., and that someone first called 911 at 11:59 a.m. Thus, the attack happened during this interval.

{¶ 74} Following her attack, Tolliver was missing her platinum teeth overlay or her "grill," her purse, her cell phones, and wallet. Tolliver told Johnson that she had between $500 to $600 in her pocket. Her pockets were inside out when she arrived at the emergency room.

{¶ 75} After the attack, Florence Fontello, an inmate at the Portage County Jail was a passenger in a car with her boyfriend at the time, a girl from West Virginia, and David Smith. She overheard her boyfriend, Randy, ask Smith about what happened to a girl named "Q." Fontello heard Smith respond that he "got that bitch with a hammer." She identified Smith in the courtroom. Randy also asked Smith something like "what he got from Q," but Fontello did not hear Smith's response, if any. Fontello agreed on cross-examination that she had four or five felony convictions, and she also admitted to previously saying that Randy was lying about what Smith said in the car that day. However, Fontello explained that she was "on the run" at the time and did not want to be involved. She did not tell Lieutenant Johnson what she knew because she was afraid.

{¶ 76} Smith's fiancée, Margaret Austin, testified for the defense. On October 16, 2015, Austin arrived at work early, before 7:00 a.m., and she called Smith to tell him that her company was hiring part-time employees and that he should come there right away to submit an application. Her phone records show that the two were calling and texting one another frequently that morning. Austin testified that Smith came to her job, submitted his application, and brought her lunch. She said he sat with her during her 20-minute lunch break, from approximately 11:27-11:46 a.m.

{¶ 77} Austin's co-worker, Robin Layne, testified that she always took her lunch first at 11 a.m., before Austin, since Layne is a diabetic. She and Austin each had a 20-minute lunch period that they could not take at the same time. On the day in question, Layne remembers Austin saying that Smith was bringing her lunch and coming to put in his application. When Layne's lunch was over at approximately 11:20 a.m., Smith was not there yet because Austin was still waiting for Smith to bring her food. Layne explained that when Smith had come in the past, he would poke his head into the plant. This day, however, she did not see Smith.

*State v. Smith*, No. 2016-P-0074, 2018 WL 6313398, at *7 (Ohio Ct. App., Dec. 3, 2018).

PROCEDURAL HISTORY

A.     State Conviction

On March 31, 2016, the Portage County Grand Jury indicted Mr. Smith on two counts of attempted murder (Count One in violation of Ohio Rev. Code §§ 2923.02, 2903.02(A), and 2929.02; Count Two in violation of Ohio Rev. Code §§ 2903.02, 2903.02(B), and 2929.02), one count of felonious assault (Ohio Rev. Code §§ 2903.11(A)(1) and/or (2)), one count of aggravated robbery (Ohio Rev. Code § 2911.01(A)(3)), and one count of aggravated burglary (Ohio Rev. Code § 2911.11(A)(1), (B)). (State Court Record, ECF #7-1 at PageID 102-107). On April 4, 2016, Mr. Smith plead not guilty to all charges. (*Id.* at PageID 108).

Mr. Smith moved to suppress all evidence related to any eyewitness identification and testimony by the victim Quortney Tolliver, and any testimony relating to Ms. Tolliver's identification of Mr. Smith. Mr. Smith claimed Ms. Tolliver's identification was the product of improper police conduct that was so impermissibly suggestive it made the identification unreliable. (*Id.* at PageID 109-110). Mr. Smith also moved for disclosure of evidence relating to DNA analysis so the evidence could be analyzed by defense's expert witness. (*Id.* at PageID 111-12).

After a hearing on the motion to suppress, Mr. Smith submitted a memorandum in support of suppressing the identification. (*Id.* at PageID 116-22). The State also filed a brief in opposition to the motion to suppress. (*Id.* at PageID 128-35).

Mr. Smith filed a motion in limine to exclude any testimony regarding his DNA being a match and part of the Ohio State indexing system. (*Id.* at PageID 136-38). He then moved to compel discoverable evidence, *i.e.*, his prior criminal records and those of the State's witnesses. (*Id.* at PageID 140-41). Mr. Smith next filed a *Daubert* motion and a motion to exclude testimony

6

regarding cell phone towers or the tracking of his cell phone (*Id.* at PageID 142-47), as well as another motion in limine to exclude any references in a December 7, 2015 audio recording to his criminal history, parole status, and past incarcerations. (*Id.* at PageID 148-49). Mr. Smith again moved the State to produce evidence regarding DNA material gathered from Ms. Tolliver's residence. (*Id.* at PageID 150-52). Mr. Smith also filed a Notice of Alibi stating that, at the time of the offenses, he was in Mantua, Ohio at Mantaline Corporation looking for work, and then had lunch with his fiancée, Margaret Austin, an employee of Mantaline. (*Id.* at PageID 163-64).

After a hearing, the court addressed the issues of whether the single photo shown to Ms. Tolliver of Mr. Smith, together with Lt. Johnson's comments, were so impermissibly suggestive as to create a substantial likelihood of irreparable misidentification, and whether the identification itself was unreliable under the totality of the circumstances. (*Id.* at PageID 166). The court denied the motion. (*Id.* at PageID 167). Mr. Smith gave notice of his intent to use the audio recording of Lt. Johnson and Ms. Tolliver's interview on December 9, 2015, with redactions to references concerning Mr. Smith's criminal past and parole status. (*Id.* at PageID 168-69). On August 10, 2016, the court denied Mr. Smith's motion to compel the State to produce DNA information, sustained his motion to exclude portions of the December 7, 2015 audiotape, sustained his motion to exclude testimony regarding the DNA index evidence, and sustained the motion to compel the State to produce witness criminal history. (*Id.* at PageID 170-72).

Regarding the *Daubert* motion, the court found that Ron Witt, a T-Mobile employee, was only to be called as a fact witness to testify concerning factual data from the cell phone records; he would not be offered as an expert witness. (*Id.* at PageID 171). The court determined that the methodology of cell site analysis has been widely used and accepted in Ohio, and so a *Daubert*

7

hearing was not necessary. (*Id.* at PageID 171-72). Mr. Smith gave another notice of his intention to use the audio recording of his December 7, 2015 interview with Lt. Johnson. (*Id.* at PageID 173). Mr. Smith then submitted his proposed jury instruction. (*Id.* at PageID 174-76).

During trial, the court granted the State's motion to dismiss Count Two. (*Id.* at PageID 177). The jury found Mr. Smith guilty on all remaining counts. (*Id.* at PageID 178).

On November 7, 2016, the court merged the attempted murder and felonious assault convictions for sentencing, with the State electing sentencing on attempted murder. (*Id.* at PageID 179-82). Mr. Smith was sentenced to 11 years in prison for attempted murder, 11 years in prison each for aggravated robbery and aggravated burglary to be served concurrently with each other but consecutively with the attempted murder sentence, and an additional consecutive year in prison for violation of post-release control, for an aggregate prison term of 23 years. (*Id.*).

**B.    Direct Appeal**

On November 29, 2016, Mr. Smith, through new counsel, appealed to the Eleventh District. (ECF #7-1 at PageID 183-87). In his brief, he raised the following assignments of error:

1.    The trial court committed prejudicial error by denying appellant's motion to suppress based upon a finding that R.C. 2933.83 did not apply and thereby violating Smith's Fourth and Fourteenth Amendment rights and Article I, Section 14 of the Ohio Constitution against unreasonable searches and seizures.

2.    Smith's convictions are against the manifest weight of the evidence in violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, Sections 10, & 16 of the Ohio Constitution.

(*Id.* at PageID 194-227). The State filed a brief in opposition. (*Id.* at PageID 237-59).

Mr. Smith then moved pro se to amend his brief to include an audio recording of Lt. Johnson's December 2015 interview with the victim. (*Id.* at PageID 260-61). The court denied Mr.

Smith's motion, noting he was represented by counsel and had no right to hybrid representation, but because the audio recording was part of the record, the court would consider that evidence to the extent necessary to resolve the assigned errors. (*Id.* at PageID 262). Mr. Smith's counsel filed a notice of additional authority and motion to supplement Mr. Smith's brief, arguing to apply the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), which set forth a new rule regarding use of cellular phone location data obtained without a search warrant. (*Id.* at PageID 263). He sought to add a third assignment of error:

> Smith was denied his constitutional rights against unreasonable searches and seizures guaranteed by the Fourth and Fourteenth Amendment of the U.S. Constitution and Article I, Section 14 of the Ohio Constitution.

(*Id.* at PageID 263-73). The State moved to strike Mr. Smith's additional argument. (*Id.* at PageID 393).

The Eleventh District granted the State's motion, struck Mr. Smith's additional argument, and overruled the motion to supplement because oral argument was complete. (*Id.* at PageID 394-95). However, the Eleventh District noted the supplemental argument could be raised in a proceeding under Rule 26(B) of the Ohio Rules of Appellate Procedure. (*Id.*). On December 3, 2018, the Eleventh District affirmed the trial court's judgment. (*Id.* at PageID 396-423).

On February 4, 2019, Mr. Smith, acting pro se, filed a Notice of Appeal with the Supreme Court of Ohio. (*Id.* at PageID 424-25). He also moved for leave to file a delayed appeal (*id.* at PageID 426-29), which the Supreme Court of Ohio granted (*id.* at PageID 460). In his memorandum in support of jurisdiction, Mr. Smith raised a single proposition of law:

> Error by denying appellant Motion to Suppress based upon a finding that R.C. 2933.83 did not apply and thereby violating Smith's Fourth Amendments rights and Article 1, Section 14 of the Ohio Constitution against unreasonable search and seizures.

(*Id.* at PageID 461-82). The State filed a memorandum opposing jurisdiction. (*Id.* at PageID 483-98). On July 10, 2019, the Supreme Court of Ohio declined to accept jurisdiction. (*Id.* at PageID 499).

**C.      Petition to Vacate**

On November 3, 2017, Mr. Smith filed a Petition to Vacate or Set Aside Judgment of Conviction or Sentence. (ECF #7-1 at PageID 500-05). He made the following claims:

  1.      The Trial Court Erred When It Excluded Impeachment Material Pursuant To Evid.R. 613(B) And Evid.R. 616(A).

  2.      Ineffective Assistance Of Trial Counsel, Counsel failed to play an audio between Lt. Johnson and Quortney Tolliver.

(*Id.* at PageID 501, 504). He also moved for the appointment of counsel. (*Id.* at PageID 506-07). The State opposed the motion and the post-conviction petition. (*Id.* at PageID 509-22). On February 1, 2018, the trial court concluded Mr. Smith failed to provide substantive grounds for relief and dismissed the post-conviction petition. (*Id.* at PageID 552-54). Mr. Smith did not appeal.

**D.      Application to Reopen Appeal**

On February 12, 2019, Mr. Smith, pro se, filed an application for reopening his appeal pursuant to Appellate Rule 26(B). (*Id.* at PageID 559-69). In support, Mr. Smith claimed appellate counsel was ineffective for not raising the following assignments of error on appeal:

  1.      A trial court errs and Abuses its Discretion and prejudice a defendant and a right to Due Process and a fair trial, when it excludes impeachment material pursuant to Evid.R. 613(B) and Evid.R. 616(A) (B). Thereby violating appellant's right to present a meaningful defense as guaranteed by the compulsory process clause of the Sixth Amendment, the due process clause of the Fourteenth Amendment, and Article 1 Section 10 of the Ohio Constitution.

10

2.      A trial court errs and abuses its discretion and prejudices a defendant and a right to a fair trial and impartial trial and due process, when it tells a prosecutor to object to impeachment material.

3.      Appellant received ineffective assistance of appellate counsel based on the failure to raise ineffective assistance of trial counsel for not filing constitutional rights against unreasonable searches and seizures guaranteed by the Fourth and Fourteenth Amendment of the U.S. Constitution and Article 1 Section 14 of the Ohio Constitution.

4.      Appellant received ineffective assistance of appellate counsel based on failure to raise ineffective assistance of trial counsel for the state to allow Lt. Johnson to testify to cell tower evidence and opinion to evidence and guilt of appellant.

5.      Appellant received ineffective assistance of appellate counsel for not challenging the attempted murder conviction as lacking support.

(*Id.*).

On March 15, 2019, Mr. Smith filed a "Motion for Official Notice of Legal Instructions" instructing his appellate attorney to provide him with the transcripts and other documents from his case. (*Id.* at PageID 581-83). The Eleventh District denied Mr. Smith's motion, stating that counsel no longer represented him, so the appellate court no longer had authority over counsel. (*Id.* at PageID 584). Mr. Smith then moved to supplement his application for reopening because he had received the transcripts from counsel, which the Eleventh District allowed. (*Id.* at PageID 585-613). On October 2, 2019, the Eleventh District denied Mr. Smith's application for reopening his appeal. (*Id.* at PageID 614-24).

On November 15, 2019, Mr. Smith, pro se, filed a Notice of Appeal with the Supreme Court of Ohio. (*Id.* at PageID 625-26). In his memorandum in support of jurisdiction, he raised the following propositions of law:

I.      The trial court improperly excluded the audio of Lt. Johnson and David Smith under Evidence Rule 608(A) Thereby violating appellant's right to

11

present a meaningful defense as guaranteed by the compulsory process clause of the Sixth Amendment, the due process clause of the Fourteenth Amendment, and Article 1 Section 10 of the Ohio Constitution.

II.     A trial court errs and abuses its discretion and prejudices a defendant and a right to a fair trial and impartial trial and due process, when it tells a prosecutor to object to impeachment material.

III.    Appellant received ineffective assistance of appellate counsel based on failure to raise ineffective assistance of appellant counsel for the state to allow Lt. Johnson to testify to cell tower evidence and opinion to evidence and guilt of appellant.

IV.     Appellant received ineffective assistance of appellate counsel for not challenging the testimony of fact finder witness Ron Witt who gave testimony as an expert witness, under Evid.R. 701.

V.      Appellant received ineffective assistance of appellate counsel for not challenging the prosecution attorney committing prosecutorial misconduct that deprived appellant of his right to a fair trial and tampering with a witness.

(*Id.* at PageID 627-43). The State waived filing a memorandum opposing jurisdiction. (*Id.* at PageID 644). On February 4, 2020, the Supreme Court of Ohio declined to accept jurisdiction. (*Id.* at PageID 658).

## FEDERAL HABEAS CORPUS

Mr. Smith filed this petition on February 26, 2020, asserting six grounds for relief, as follows:

I.      Petitioner's convictions were against the manifest weight of the evidence and the sufficiency of the evidence, which was ruled on by the state court.

II.     The trial court committed prejudicial error by denying Petitioner's motion to suppress the improper and biased identification of Petitioner which was impermissibly suggestive in violation of petitioner's rights afforded by the Fourth and Fourteenth Amendment that prevent unreasonable searches and seizures.

12

III. Petitioner was denied the effective assistance of appellate counsel when counsel failed to properly present and argue the denial of due process of law when a material audio recording was excluded from the hearing of the jury, which violated Petitioner's right to present a meaningful defense as granted by The Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

IV. Petitioner was denied the effective assistance of appellate counsel when counsel failed to properly present and argue the denial of a fair and impartial trial and the denial of due process when the trial court instructed prosecutor to object to impeachment material related to the critical testimony of state witness Lt. Johnson.

V. Petitioner was denied the effective assistance of appellate counsel based on the failure to raise ineffective assistance of trial counsel for the state to allow Lt. Johnson to testify to cell tower evidence and guilt of petitioner.

VI. Petitioner was denied the effective assistance of appellate counsel for not challenging the testimony of fact finder witness Ron Witt, who gave testimony as an expert witness when he was unqualified to do so as a factfinder witness.

(ECF #1, PageID 6-13).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Smith's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore act as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision involves an unreasonable application of the Court's precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529

14

U.S. at 407. The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable considering the evidence presented in state court. *Harrington*, 562 U.S. at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt,* 571 U.S. at 18.

Under § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state law and state procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-129 (1982). Federal courts must accept a state court's interpretation of its statutes and its rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03. To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim

being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* at 103.

PROCEDURAL HURDLES TO HABEAS

The State asserts Mr. Smith procedurally defaulted Grounds One, Six, and Seven. (ECF #7 at PageID 54-62, 92-95). Additionally, it argues Ground One is a non-cognizable challenge to a matter of state law. Otherwise, the State argues Mr. Smith's claims are meritless.

## I.      Non-Cognizability

For purposes of argument, the State splits Mr. Smith's Ground One into two distinct propositions. Ground One states: "Petitioner's convictions were against the manifest weight of the evidence and the sufficiency of the evidence, which was ruled on by the state court." (ECF #1 at PageID 6). The State argues the manifest weight claim is non-cognizable and the sufficiency claim is procedurally defaulted. (ECF #7, PageID 54). I address the manifest weight claim here, and will discuss the sufficiency claim simultaneously with the other claims that are potentially defaulted.

Federal habeas corpus relief is limited, and alleged errors in state law that do not violate a constitutional right are not cognizable in a federal habeas proceeding. In *Hess v. Eberlin*, No. 2:04-cv-1144, 2006 WL 2090093, at *6-7 (S.D. Ohio Jul. 25, 2006), the court explained that a manifest weight of the evidence claim is not an issue recognizable in federal habeas:

> To the extent that petitioner asserts here that his convictions are against the manifest weight of the evidence, such claim is not appropriate for federal habeas corpus review. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983). In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be

16

enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses. *Jackson*, 443 U.S. at 319; *Walker*, 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 485 N.E.2d 717 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31, (1982). Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

*Id.* at *6-7.

The distinction is important, especially in the habeas context, because "the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary sufficiency." *Tibbs*, 457 U.S. at 45. That same Due Process protection does not apply to a manifest weight claim. *Id.*; *see also Johnson v. Williams*, No. 3:10CV0005, 2011 WL 1103890, at *2 (S.D. Ohio Mar. 3, 2011), *report and recommendation adopted*, 2011 WL 1100468 (S.D. Ohio Mar. 22, 2011); *Morris v. Hudson*, No. 5:06CV2446, 2007 WL 4276665, at *10 (N.D. Ohio Nov. 30, 2007).

Manifest weight claims are derived purely from state law whereby the state appellate court sits as a "thirteenth juror and disagrees with fact finder's resolution of conflicting testimony" and finds that the "jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered." *Morris v. Hudson*, No. 5:06CV2446, 2007 WL 4276665, at *10 (N.D. Ohio Nov. 30, 2007).

Mr. Smith's manifest weight of the evidence claim is not cognizable in federal habeas corpus review. Therefore, I recommend the manifest weight portion of Ground One be **DISMISSED** as non-cognizable.

## II.    Exhaustion

A court may not grant a petition for habeas corpus unless it appears that the petitioner has exhausted available state court remedies, there is an absence of available state corrective process, or circumstances exist that render such state process ineffective to protect the rights of the petitioner. § 2254(b)(1). Typically, the exhaustion requirement is satisfied when the petitioner fairly presents all claims to the highest court in the state in which the petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim is fairly presented when both the factual and legal basis for the claim has been introduced to the state courts. *Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In contrast, where state court remedies are no longer available, procedural default, discussed more fully below, rather than exhaustion, applies. *Id.*

## III.    Procedural Default

Under the doctrine of procedural default, the federal habeas court may not review a claim for relief when the petitioner failed to obtain consideration of that claim on its merits in state court, either because the petitioner failed to raise it when state remedies were still available or

because of some other procedural default. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). There are two avenues by which a petitioner's claim may be procedurally defaulted. First, a claim may be procedurally defaulted if the petitioner fails to raise that claim in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d 789, 806 (citing *O'Sullivan*, 526 U.S. at 848 (1991)); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806.

Second, procedural default of a claim occurs when a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court*." Id.* To determine whether a petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

The Supreme Court has stated that

in all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of a claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or

> demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991). A fundamental miscarriage of justice results from the conviction of one who is "actually innocent." *Murray,* 477 U.S. at 496.

A showing of cause requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (cleaned up)). There is no prejudice where the petitioner does not show a reasonable probability of a different verdict. *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003).

Ineffective assistance of counsel may serve as cause to excuse a procedural default, but the ineffective assistance claim itself must not be procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Attorney neglect, ignorance, or inadvertence, however, does not constitute cause to excuse a procedural default unless counsel's performance was constitutionally deficient under the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Coleman*, 501 U.S. at 752-55; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495. A "fundamental miscarriage of justice" occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *Schlup v. Delo*, 513 U.S. 298, 327 (1995). A valid actual innocence claim must be supported by new evidence not presented at trial that is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Id.* at 315. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

Turning to this case, the State argues Mr. Smith procedurally defaulted Grounds One, Six, and Seven. (ECF #7 at PageID 54-62, 92-95). I address each in turn.

### A.     Ground One

In Ground One, Mr. Smith alleges he was denied fundamental fairness when he was convicted against the manifest weight and sufficiency of the evidence. As discussed above, the manifest weight portion of Ground One is non-cognizable. The sufficiency claim remains at issue.

The State asserts that in the Eleventh District, Mr. Smith not only argued his conviction was against the manifest weight of the evidence, but also advanced a sufficiency-of-the-evidence claim based on the Due Process Clause of the federal Constitution that the court rejected. When he appealed *pro se* to the Ohio Supreme Court, he abandoned the sufficiency of the evidence claim and therefore the State asserts that claim is procedurally defaulted. (ECF #7, PageID 61).

On November 29, 2016, Mr. Smith appealed to the Eleventh District. (ECF #7-1 at PageID 183-87). His brief asserted that his convictions "are against the manifest weight of the evidence in

violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution and Article I, Sections 10, & 16 of the Ohio Constitution." (*Id.* at PageID 194-227). On December 3, 2018, the Eleventh District affirmed the trial court's judgment. (*Id.* at PageID 396-423).

On February 4, 2019, Smith filed a Notice of Appeal with the Supreme Court of Ohio. (*Id.* at PageID 424-25). In his Memorandum in Support of Jurisdiction, Smith raised the following, single proposition of law:

> Error by denying appellant Motion to Suppress based upon a finding that R.C. 2933.83 did not apply and thereby violating Smith's Fourth Amendments rights and Article 1, Section 14 of the Ohio Constitution against unreasonable search and seizures.

(*Id.* at PageID 461-82). Nowhere did Mr. Smith's Memorandum raise the issue of whether the evidence was sufficient to convict him. (ECF #7-1 at PageID 627-43).

The doctrine of res judicata precludes Mr. Smith from now pursuing the unexhausted claim in state courts. In Ohio, res judicata bars state courts from considering constitutional claims in post-conviction collateral attacks when those claims have already or could have been fully litigated on direct appeal. *Monzo v. Edwards,* 281 F.3d 568, 576 (6th Cir. 2002); *see also Hannah v. Ishee,* 694 F.3d 596, 613-14 (6th Cir. 2012) (explaining that under Ohio's doctrine of res judicata, a defendant may not raise a claim in a post-conviction proceeding that either could have been or actually was fully litigated at trial or on direct appeal). The state court's application of res judicata constitutes an independent and adequate state ground barring federal habeas relief. *Coleman,* 268 F.3d at 429.

Here, as additionally explained below, Mr. Smith raised a sufficiency of the evidence claim to the Eleventh District but did not pursue that claim in the Supreme Court of Ohio when he appealed the Eleventh District's decision on direct appeal. Therefore, the sufficiency claim in

Ground One is procedurally defaulted. *See Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985) (noting that where a petitioner raises an issue in a direct appeal to the appellate court but does not raise the same issue in a motion for leave to appeal to the Supreme Court of Ohio, the petitioner is foreclosed from invoking both Ohio's collateral attack remedies and habeas relief).

Mr. Smith admits this issue was not raised before the Supreme Court of Ohio, but asserts cause for the default, claiming the failure was "due to appellate counsel's labeling of the issue as a manifest weight argument when the issue was presented and ruled on as both a manifest weight and sufficiency of the evidence." (ECF #20 at PageID 2872). "The mislabeling misled Petitioner into believing that the issue was not constitutional and would be futile to exhaust for federal purposes. This was not the case." (*Id.*). As best can be discerned, Mr. Smith is not arguing that his attorney failed to place the sufficiency of the evidence claim before the appellate court. Clearly, the Eleventh District analyzed the claim as both manifest weight and sufficiency in light of appellate counsel's reference to a Due Process violation. Rather, he is claiming that his attorney's failure to explicitly use the words "insufficient evidence" misled him into believing his claim was not constitutional in nature and therefore futile to exhaust with the Supreme Court of Ohio. This assertion does not save Mr. Smith's sufficiency claim from procedural default.

In *Edwards*, the Supreme Court acknowledged that ineffective assistance of counsel can constitute cause for a default, but also explained that the "ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is *itself* an independent constitutional claim" that must be exhausted in state court. *Edwards*, 529 U.S. at 451-52. If the separate ineffective assistance claim is also procedurally defaulted, a petitioner cannot rely on that claim to excuse the procedural default of another constitutional claim unless the

23

petitioner can show cause and prejudice to excuse the default of the ineffective assistance claim. *Id.* at 453.

Under Ohio law, ineffectiveness of appellate counsel claims must be raised in an Appellate Rule 26(B) application to reopen an appeal. *Williams v. Lazaroff,* 648 Fed. App'x 548, 553 (6th Cir. 2016). Here, Mr. Smith filed a timely application to reopen his direct appeal and claimed several errors on appellant counsel's part but did not assert any claim that his appellate attorney was ineffective because appellate counsel's labeling of the issue as a manifest weight argument misled him into believing that the issue was not constitutional. Because Mr. Smith omitted that particular claim from his Rule 26(B) application, it has been defaulted. *See Scott v. Warden,* No. 2:21-cv-04996, 2022 WL 1186184, *6 (S.D. Ohio Apr. 21, 2022). Mr. Smith has not asserted any cause to overcome the procedural default of his ineffective assistance of appellate counsel claims. Because Mr. Smith cannot prove cause, there is no reason to analyze whether appellate counsel's alleged error actually prejudiced Mr. Smith. *See Murray,* 477 U.S. at 494. Moreover, while Mr. Smith briefly states failure to review the claim would result in a miscarriage of justice, he has not shown this is an extraordinary case, where the constitutional violation has probably resulted in the conviction of one who is actually innocent, by supporting his claim with new evidence not presented at trial. *Id.* at 495-496; *Schlup,* 513 U.S. at 327 (1995).

Mr. Smith failed to assert the sufficiency claim in Ground One at each level of direct appeal, the claim is procedurally defaulted, and Mr. Smith has failed to overcome the default. Therefore, I recommend the District Court **DISMISS** Ground One as both non-cognizable (manifest weight) and procedurally defaulted (insufficient evidence).

24

**B.      Grounds Six and Seven**

In Ground Six, Mr. Smith argues he was denied effective assistance of appellate counsel because counsel failed to challenge the testimony of fact witness Ron Witt, who he asserts improperly testified as an expert witness regarding phone records. (ECF #1 at PageID 13). The State responded that Ground Six is procedurally defaulted because it has never been fairly presented to the Ohio courts and no procedural mechanism remains for Mr. Smith to present it. (ECF #7 at PageID 92). The State points out that the first time Mr. Smith raised the claim was in his Memorandum in Support of Jurisdiction to the Supreme Court of Ohio appealing his Rule 26(B) application denial, which is insufficient to preserve the claim for habeas review. (*Id.*).

Ground Seven stands in an identical procedural posture to Ground Six. In Ground Seven, Mr. Smith argues ineffective assistance of appellate counsel due to counsel's failure to "challenge the prosecuting attorney committing prosecutorial misconduct of tampering with a defense witness and improper statements during closing arguments that deprived Petitioner of his right to a fair trial." (ECF #1 at PageID 15). Mr. Smith references the closing argument of the prosecutor in his trial, which he believes "vouched" for Lt. Johnson and the victim. (ECF # 20 at PageID 2943). Additionally, he claims the prosecutor "tried to tamper with [a] defense alibi witness" by meeting with the witness, causing the witness to leave the courthouse without testifying. (*Id.* at PageID 2944).

In his November 3, 2017 Petition to Vacate or Set Aside Judgment of Conviction or Sentence, Mr. Smith did not assert Grounds Six or Seven. (ECF #7-1, PageID 500-503). In his Rule 26(B) application, he claimed appellate counsel was ineffective by not raising five separate claims – but none of those involved Mr. Witt's testimony or prosecutorial misconduct. (*Id.* at

PageID 559-569). The first time Mr. Smith challenged appellate counsel's failure to assign as error the admission of Mr. Witt's testimony was in his November 15, 2019 Memorandum in Support of Jurisdiction challenging the appellate court's denial of his Rule 26(B) application. (*Id.* at PageID 640). This is also the first time Mr. Smith challenged his appellate counsel's failure to raise the issue of prosecutorial misconduct. (*Id.*). The Supreme Court of Ohio declined to accept jurisdiction. (*Id.* at PageID 658).

"[A]ccording to Ohio Supreme Court rules and precedents, the Supreme Court of Ohio will not consider federal constitutional claims that have not been initially presented to the court of appeals." *Smith v. Anderson*, 104 F. Supp. 2d 773, 799 (S.D. Ohio 2000) (citing *State v. Phillips*, 272 N.E.2d 347, 352 (Ohio 1971)). As in Ground One, Mr. Smith's failure to present these claims at each level of state court appellate review renders his claims unexhausted, and because Mr. Smith no longer has a remedy available to him in the state courts, Grounds Six and Seven are procedurally defaulted. Mr. Smith has not asserted cause for the default, nor has he asserted an argument that failure to review the claim will result in manifest injustice.

I conclude Grounds Six and Seven are defaulted and recommend the District Court **DISMISS** them.

### DISCUSSION OF REMAINING GROUNDS

With Grounds One, Six, and Seven procedurally barred, I now turn to the merits of Grounds Two, Three, Four, and Five. Ground Two deals with Mr. Smith's challenge to the admission of Ms. Tolliver's identification of him as the person who attacked her. The remaining grounds deal with ineffective assistance of Mr. Smith's appellate counsel.

I.      **Ground Two – Identification Evidence**

In Ground Two, Mr. Smith asserts the trial court "committed prejudicial error by denying Petitioner's motion to suppress the improper and biased identification of petitioner which was impermissibly suggestive in violation of petitioner's rights afforded by the Fourth and Fourteenth that prevent unreasonable searches and seizures." (ECF #1 at PageID 7). The Eleventh District explained the circumstances surrounding Ms. Tolliver's identification of Mr. Smith as her attacker:

> The evidence reveals that Quortney Tolliver was attacked in her home on October 16, 2015. She sustained severe injuries, including skull and facial fractures. She was hospitalized and in a medically induced coma for approximately two weeks.
>
> {¶ 19} During her hospital stay, Tolliver was presented with several photo arrays, but did not identify any of the 24 individuals as her attacker. She was unable to speak at this time since she had a tracheal tube to aid in her breathing. Tolliver was, however, able to write and shake her head in response to questioning. She asked the detectives who did this to her. Tolliver also asked about criminal charges pending against her for drug trafficking. She told detectives in November of 2015 that she did not remember the attack.
>
> {¶ 20} In December of 2015, Lieutenant Johnson visited Tolliver at the nursing facility where she was undergoing rehabilitation. Tolliver and her mother were present. Johnson recorded his meeting with Tolliver and her mother, and the audio of their meeting was transcribed. The audio was played at the suppression hearing and the transcript was admitted as an exhibit.
>
> {¶ 21} Upon entering Tolliver's room, Johnson introduced himself and immediately stated, "I think I found out who did this to you." Tolliver first asked, "who is that?" upon being shown Smith's photo, but then within seconds, she acknowledged that he is an individual who had given her a ride before.
>
> {¶ 22} Johnson then told Tolliver that Smith had nothing good to say about her. She responded, "Who the fuck is he? I mean, who is he? What do you mean? I don't understand." Johnson then told Tolliver that she was text messaging Smith on the day she was attacked. Tolliver explained that Smith was supposed to give her another ride to Cleveland to visit her brother, but then Tolliver stated she still cannot remember the day she was attacked, and that she "barely remembers waking up that day."

{¶ 23} When Tolliver asked if Smith was in custody, Johnson responded, "not yet. He will be." Johnson then stated, "he's hoping you're dead," explaining that with Tolliver alive, Smith is "in trouble."

{¶ 24} Tolliver's mother asked why Smith did this, and Johnson explained that Smith said in his interview that Tolliver had a history of "ripping people off" in her illegal activities and that she had this "coming to her." Johnson then told them "he's cold hearted." "He's done prison time for attempted murder. He's got a long criminal history."

{¶ 25} Tolliver explained that she met Smith a few times and that she barely knew him, but that they had a mutual female friend. Tolliver had previously paid Smith $20 to take her to Cleveland, and she remembered text messaging Smith the night before for a ride. Tolliver denied that Smith was ever in her trailer.

{¶ 26} During that same meeting, Tolliver described a dream she had while she was unconscious in which Smith was at her trailer. She described him acting alone and explained, "I don't know if it was me remembering this" or a dream. She recalled getting hit with a hammer three times before going unconscious. Tolliver also remembered in her dream falling on her friend's porch after the attack. She could not say for sure if this was a dream or a memory, stating "maybe I do remember it."

{¶ 27} Johnson then told Tolliver that Smith's DNA was found in her bathroom sink mixed with her blood. Then Johnson advised Tolliver and her mother to keep this information to themselves because Smith left her for dead, stole from her, and rummaged through her home. Johnson told Tolliver and her mother that he "left her for dead" at least three times, and that this was "cold-blooded" twice.

{¶ 28} Johnson met with Tolliver again in February of 2016 and the transcript of this meeting was likewise introduced at the suppression hearing. Tolliver's memory was much clearer during this meeting.

{¶ 29} The night before her attack Tolliver recalled sleeping at her friend's home and then that morning she needed a ride because she had lost her license. She recalls that "D" called her, who she confirmed was Smith, and he agreed to give her a ride.

{¶ 30} Tolliver had known Smith about two weeks. She was expecting him that day and she recalls opening her trailer door for him. When she went to get her shoes on, Smith swung at her with a hammer. Tolliver explained that she tried to reach her taser to defend herself, but that he hit her again causing her to fall to the ground.

{¶ 31} The next thing Tolliver remembers was waking up in the hospital. She said she was unable to remember these details before stating: "Like in my coma I was having dreams, so many dreams, and that was one of them."

{¶ 32} When Johnson asked Tolliver during this February interview how certain she was that this was not a dream, she said 100 percent. Tolliver also confirmed that Smith had never before entered her trailer.

{¶ 33} Johnson testified during the suppression hearing and explained that he first suspected Smith was involved in the crimes when he learned that Smith and Tolliver had texted or called one another approximately 80 times during the 24 hours beforehand.

{¶ 34} Tolliver testified at the suppression hearing that she initially pretended not to know who the photo depicted that Johnson showed her of Smith while she was in the rehabilitation facility. She said she lied because her mother was there. Tolliver did not want to reveal in front of her mother that she was selling drugs at the time and that Smith was calling her to buy drugs. Tolliver testified that she remembered Smith attacking her before Johnson showed her his photo.

*Smith*, 2018 WL 6313398 at *2-4.

The Supreme Court has held that an identification violates a defendant's right to due process where the identification procedure was so unnecessarily suggestive as to run the risk of irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967); *Neil v. Biggers*, 409 U.S. 188 (1972). "Due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 716, 724 (2012). But even when the police use such a procedure, suppression of the resulting identification is not the inevitable consequence. *Id.*

Instead of mandating a per se exclusionary rule, the Court has concluded the Due Process Clause requires a case-by-case basis assessment of whether improper police conduct created a "substantial likelihood of misidentification." *Biggers*, 409 U.S. at 201; *see Brathwaite*, 432 U.S., at 116. "[R]eliability is the linchpin" of that evaluation. *Braithwaite*, 432 U.S. at 114. Where the

29

"indicators of [a witness's] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Id.* Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury. *Perry*, 565 U.S. at 724.

In the Sixth Circuit, a court judging reliability considers the totality of the circumstances, including various factors that include: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification. *Howard v. Bouchard*, 405 F.3d 459, 472 (6th Cir. 2005) (citing *Biggers*, 409 U.S. at 199-200 and *Braithwaite*, 432 U.S. at 114).

Before trial, defense counsel moved to suppress Ms. Tolliver's identification of Mr. Smith as her attacker on this basis. The trial court denied the motion, explaining as follows:

> The issues before the Court are twofold. First, whether the single photo of defendant, coupled with the comments made by Lt. Johnson, were so impermissibly suggestive as to create a very substantial likelihood of irreparable misidentification, and thereby violate due process; and second, whether the identification itself was unreliable under the totality of the circumstances.
>
> Ms. Tolliver was shown 24 photographs total in the initial arrays which did not include the Defendant, as he had not been developed as a suspect at that time. It was not until Lt. Johnson was able to obtain cell phone records and confirm that Defendant and Ms. Tolliver had been in contact and therefore knew each other, that he confronted Ms. Tolliver with the photograph of defendant.
>
> If Defendant had been a stranger to Ms. Tolliver, and Lt. Johnson had approached her in the manner he did, the Court could find that the procedure was possibly suggestive. However, based upon the information Lt. Johnson had at the time, it was evident that Ms. Tolliver was at minimum, recently acquainted with the Defendant. Within the 24 hours prior to the attack, they had been in contact more than 80 times. It would be logical for an investigator to approach the potential

identification of a suspect known to the witness in this manner, in light of the circumstances. The potential suggestibility under these facts would not give rise to a substantial likelihood of misidentification, and would not violate due process.

Therefore, the Court finds that Defendant's Motion to Suppress the in court and out of court identification is not well taken, and is therefore overruled.

(ECF #7-1 at PageID 235-36). On direct appeal, the Eleventh District concluded the identification

evidence was appropriately introduced, writing as follows:

{¶ 37} As alleged by Smith, we agree that the identification procedure used by Johnson was impermissibly suggestive and unnecessary. Johnson made repeated disparaging statements about Smith and even said that Smith's DNA was found in Tolliver's bathroom sink mixed with her blood before Tolliver identified him as her attacker. Thus, consistent with *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972), we must assess whether the identification was reliable under the totality of the circumstances.

. . .

{¶ 43} In *Biggers*, the court noted that the only case, at that time, in which a suspect's identification by a victim was excluded on this basis was *Foster v. California*, 394 U.S. 440, 442-443 (1969). *Id.* at 197. The witness in *Foster* failed to identify the suspect even despite the first suggestive lineup. Thereafter, the witness tentatively identified the suspect in a one-person confrontation between the suspect and the witness. The suspect finally positively identified Foster as "the man" in a second lineup. Foster was the only individual in both the first and second lineup. *Id.* Accordingly, the identification in Foster was excluded since it violated his right to due process because there were insufficient indicators of reliability present to outweigh the improperly obtained identification. *Foster*, at 443.

{¶ 44} Here, the trial court found that the circumstances showed that Johnson's procedure was "possibly suggestive," but that Tolliver's identification of Smith was not impermissibly suggestive because of her prior familiarity with him. Thus, the trial court concluded that under these facts, there was not a substantial likelihood of misidentification in violation of Smith's due process rights.

{¶ 45} As Smith points out, Johnson for all practical purposes told Tolliver who her attacker was and described him as cold-blooded and having a violent criminal history. Johnson also told Tolliver that Smith wanted her dead and that he thought she deserved her injuries. Johnson made these statements before Tolliver confirmed that Smith was her attacker.

{¶ 46} Smith relies on *State v. Cain*, 8th Dist. Cuyahoga No. 90425, 2008-Ohio-3674, ¶ 18, in support of his argument. In *Cain*, like *Foster*, the victim, Jobe, gave a physical description of his attacker, and Jobe ultimately identified an individual who was presented to him in a suggestive one-man photo "lineup," as his attacker. Jobe was 80 years old at the time of the attack, was not wearing his glasses, and described that it was very dark out at the time. He had never seen his attacker before or after the attack. His friend, who he was visiting that night and who was not present at the time of the attack, told Jobe that "this sounds like something her ex-husband would do." She brought Jobe a photo of her ex, which did not match Jobe's prior description of his attacker he had given police. *Id.* at ¶ 10-14. Notwithstanding the differences, Jobe identified his friend's ex-husband as his attacker. *Id.* After addressing the reliability factors, *Cain* found that the identification was unreliable under the totality of the circumstances. *Id.* at ¶ 20.

{¶ 47} Unlike the identifications in *Cain* and *Foster*, however, Tolliver knew Smith before the attack. Moreover, Tolliver explained at the hearing that she remembered all along that Smith was her attacker, but that she did not tell Johnson and the other detectives. Most of the Biggers factors are better suited for addressing the reliability of the identification of an unknown suspect. Here, the fact that Tolliver knew her attacker before the crime bolsters her identification of him. "A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed." (Citations omitted.) *State v. Huff*, 145 Ohio App.3d 555, 564, 763 N.E.2d 695 (1st Dist. 2001).

{¶ 48} Tolliver described with certainty that she had ample opportunity to view Smith at the time of her attack. She recalled Smith coming to her door, letting him in, and him striking her with a hammer. Although she said in December 2015 that she was uncertain if she was recalling a dream or the actual date of her attack, she was 100 percent certain in February 2016 and at the hearing that Smith was the person who attacked her. Thus, upon considering the totality of the circumstances surrounding the identification and the applicable factors, we disagree with Smith that her identification violates his right to due process.

{¶ 49} Thus, notwithstanding Johnson's improper statements about Smith to Tolliver before she "recalled" the day in question, her identification of him is nevertheless reliable upon considering the applicable factors. Suppression was not required, and Smith's first assignment of error lacks merit.

*Smith*, 2018 WL 6313398 at *4-6.

The Eleventh District found Lt. Johnson's identification procedures were both unnecessary

and suggestive. *Perry*, 565 U.S. at 724. Before Ms. Tolliver had identified Mr. Smith, Lt. Johnson

showed her a picture of Mr. Smith and said, "I think I found out who did this to you." He repeatedly made inappropriate and suggestive statements, noting that Mr. Smith was "not yet" in custody but "he will be"; "he's hoping you're dead"; explaining that with Tolliver alive, Mr. Smith is "in trouble"; "he's cold hearted"; and "he's done prison time for attempted murder. He's got a long criminal history." *Smith*, 2018 WL 6313398 at *3. Unquestionably, such statements are likely to influence any victim—but especially one who exhibited memory loss after a head injury—to identify Mr. Smith as the attacker.

That said, admission of the identification evidence does not violate Mr. Smith's due process rights unless the identification was also unreliable. Here, Mr. Smith argues the trial and appellate courts misapplied the test, and rather than applying the *Biggers* factors to determine whether the identification was independently reliable, "the state court collapsed the two inquiries into one step[,] and considered only the fact that the victim and Smith had two dealings with each other...." (ECF # 20 at PageID 2893). Mr. Smith argues the Eleventh District similarly focused on how the two knew each other rather than analyzing the identification using the *Biggers* factors.

*Biggers* involved an identification of a rapist by his victim, who were strangers to one another. *Biggers,* 409 U.S. at 193-96. The only opportunity the victim had to know her attacker was during the attack. *Id.* She gave an accurate description of the defendant to police immediately after the attack. *Id.* at 194. On several occasions, she viewed suspects in her home, at the police station, some in lineups and others in showups, and was shown between thirty and forty photographs and did not identify any as her assailant until she encountered the defendant in a showup seven months after the attack. *Id.* at 194-95. *Biggers* then decided whether "this identification and the

circumstances surrounding it failed to comport with due process requirements." *Id.* at 196. Using

the factors, the Court found the identification reliable. *Id.* at 201.

In applying *Biggers*, courts have consistently expressed that the factors are best suited for a

defendant and victim who do not know each other. The Sixth Circuit said as much in *United States*

*v. Beverly*, 369 F.3d 516 (6th Cir. 2004), in which a defendant's ex-wife identified him as the

robber of a bank in a surveillance photo. *Id.* at 539. The Sixth Circuit affirmed admission of the

identification and, while acknowledging the *Biggers* factors, also weighed other evidence, including

whether the witness was familiar with the suspect:

> This was not a typical police photo spread in which a witness is asked [to] identify
> an otherwise-unknown perpetrator based solely on observation at the time of the
> crime. In this instance, Mrs. Parks was being asked whether the bank surveillance
> picture in fact depicted someone she knew very well and would readily recognize.
> The *Biggers* factors are not particularly helpful in a case such as this, where the
> identification has been made by someone close to the suspect. Rather, we should be
> guided by cases in which identifications have been made by relatives or close
> friends.

*Id.* This is not the only instance where a court acknowledged the *Biggers* factors are less useful in

situations where the defendant and witness are familiar. *See, e.g., Minetos v. Scully*, 625 F. Supp.

815, 819 (S.D.N.Y. 1986) ("Another factor affecting the reliability of an identification is the prior

familiarity the witness has with the accused...[p]rior acquaintance may rule out the need for the

due process test."); *Ortiz v. Artuz*, 113 F. Supp. 2d 327, 337 (E.D.N.Y. 2000) ("Important in

finding that the identification was confirmatory and reliable is that Veliz had known petitioner for

several years from the neighborhood"), *aff'd*, 36 F. App'x 1 (2d Cir. 2002).

In light of the above, the Eleventh District appropriately took into account the relationship

between Mr. Smith and Ms. Tolliver in deciding whether the identification was reliable.

"Reliability [of an eyewitness identification] is judged under the totality of the circumstances."

*Manson v. Brathwaite,* 432 U.S. 98, 107 (1977); *see also Biggers,* 409 U.S. at 199. While the *Biggers* factors remain important, other factors, including whether the eyewitness was acquainted with the person from previous encounters, are also relevant to the reliability of the eyewitness identification. *Haliym v. Mitchell,* 492 F.3d 680, 706 (6th Cir. 2007). The Eleventh District determined Ms. Tolliver was acquainted with Mr. Smith before the attack, had ample opportunity to view Mr. Smith at the time of the attack, and Ms. Tolliver expressed a high level of certainty of her identification, after explaining she pretended not to recognize Mr. Smith when she initially viewed the photo because she did not want her mother, who was present at the time of the interview, to learn Ms. Tolliver was still selling drugs. As such, I conclude the Eleventh District's decision was not an unreasonable application of Supreme Court precedent. The Eleventh District identified several *Biggers* factors that favored a finding that the eyewitness identification was reliable and considered another obviously relevant factor, Ms. Tolliver's acquaintance with Mr. Smith, when it determined the totality of the circumstances suggested her identification was reliable.

Nor was the analysis based on an unreasonable determination of the facts in light of the evidence. There is no dispute Ms. Tolliver and Mr. Smith were acquainted with each other before the attack. The two parties exchanged upwards of 80 text messages within the 24-hour period before the attack and Ms. Tolliver had recently accepted a ride to Cleveland from Mr. Smith because she lost her license.

Further, even if the Eleventh District was required to analyze the *Biggers* factors in this context, the result would not change; under *Biggers,* Ms. Tolliver's identification is reliable. The first and second factors weigh the witness's opportunity to view the defendant at the initial

observation and the witness's degree of attention. *Biggers*, 409 U.S. at 199-200. On the day in question, Ms. Tolliver opened the door and greeted her assailant before turning to put her shoes on. She testified she had enough time to view him. Also, presumably, if the person at the door was not someone she recognized or expected, she would not have turned to put her shoes on to leave with a stranger. The attack took place mid-day in October, not in the middle of the night or under circumstances where natural light would help illuminate the assailant's face. Based on the state court's account of the interaction, it appears Ms. Tolliver had enough time and opportunity to get a good look at her assailant.

The third factor considers the accuracy of the witness's prior description of the defendant. *Id.* Ms. Tolliver did not give a description of Mr. Smith before identifying him as her attacker. In this circumstance, this factor has no bearing on the reliability of the identification.

The fourth factor is the level of certainty the witness shows at the pretrial identification. *Id.* Ms. Tolliver did not identify Mr. Smith prior to being shown his photo. Additionally, when presented with his photograph during her recovery, she claimed to not know who the man was. But later, at the suppression hearing, Ms. Tolliver testified she was 100% certain Mr. Smith had attacked her. She testified that when originally shown the photo, she pretended not to know who the photo depicted because she did not want her mother to know she was still selling drugs. She testified she remembered Mr. Smith attacking her before Lt. Johnson showed her his photo. *Smith*, 2018 WL 6313398 at *4. Deferring to the Eleventh District's findings of fact, Ms. Tolliver was 100% certain that Mr. Smith was her attacker even before being shown the photo, weighing heavily in favor of reliability.

The last factor considers the length of time between the initial observation and the identification. *Biggers*, 409 U.S. at 199-200. The initial observation of Ms. Tolliver's attacker occurred the day of the attack, October 16, 2015. She testified she knew who attacked her and would therefore be able to identify her attacker immediately after, prior to being shown the photo. She positively identified Mr. Smith after being shown his photograph in December, two months after the attack. Even assuming the later date of identification in December, a few months between the attack and identification does not automatically doom reliability when considered alongside the other factors. *See United States v. Hill*, 967 F.2d 226, 233 (6th Cir. 1992); *Biggers* 409 U.S. at 201 (finding reliability despite a seven-month gap).

Even with Lt. Johnson's unnecessarily suggestive conduct in obtaining the identification, the relevant factors do not suggest unreliability to the point of violating Mr. Smith's constitutional rights. The Eleventh District's decision to forego a detailed *Biggers* analysis because Mr. Smith and Ms. Tolliver were previously acquainted is not contrary to clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence. Therefore, I recommend Ground Two be **DENIED** on its merits.

## II.    Ineffective Assistance of Appellate Counsel

Grounds Three, Four, and Five all involve claims that Mr. Smith's appellate counsel provided ineffective assistance in violation of the Sixth Amendment. The *Strickland* standard mandates a two-part test to determine whether a defendant was denied effective assistance of counsel:

> First, defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show the deficient performance prejudiced the defense. This

requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial who result is reliable.

*Strickland*, 466 U.S. at 687.

To satisfy the deficiency prong, a defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 668. Because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). This is an extremely deferential standard, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. In particular, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690-91. Moreover, this inquiry requires eliminating "the distorting effects of hindsight ... [in order] to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The goal is not to ensure that a criminal defendant be afforded perfect counsel, but rather "to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Id.* at 687.

A defendant is entitled to the effective assistance of counsel in his first appeal of right. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). Appellate counsel's performance is judged under the same standard for evaluating trial counsel's performance found in *Strickland. Smith v.*

*Jago*, 888 F.2d 399, 405 n.1 (6th Cir. 1989); *see also Bowen v. Foltz*, 763 F.2d 191, 194 n.3 (6th Cir.

1985). Courts in this Circuit consider the following eleven factors when determining whether an

attorney on direct appeal performed reasonably competently:

1.  Were the omitted issues "significant and obvious?"

2.  Was there arguably contrary authority on the omitted issues?

3.  Were the omitted issues clearly stronger than those presented?

4.  Were the omitted issues objected to at trial?

5.  Were the trial court's rulings subject to deference on appeal?

6.  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7.  What was appellate counsel's level of experience and expertise?

8.  Did the petitioner and appellate counsel meet and go over possible issues?

9.  Is there evidence that counsel reviewed all the facts?

10. Were there omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408 at 427-28 (citing cases). The list is not exhaustive and is not intended

to "produce a correct 'score,'" but rather the inquiries are offered "merely as matters to be

considered." *Id.* at 428.

### A. Ground Three

In Ground Three, Mr. Smith argues he was denied the effective assistance of appellate

counsel when counsel

> failed to properly present and argue the denial of due process of law when a
> material audio recording was excluded from the hearing of the jury, which violated

Petitioner's right to present a meaningful defense as granted by The Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.

(ECF #1 at PageID 8).

Mr. Smith argued this same issue before the Eleventh District in his application to reopen his appeal:

Smith claims that Lieutenant Johnson's prior inconsistent statements should have been admitted at trial to impeach Johnson's credibility pursuant to Evid R. 608(A), which permits the introduction of opinion and reputation evidence of character. Smith claims that a proper foundation was laid to introduce Johnson's recorded interview with Smith to show that Johnson lied to victim[sic].

(ECF #7-1 at PageID 615). The Eleventh District explained:

However, as Smith points out, his attorney elicited testimony from Johnson on cross-examination that Johnson said things to the victim that were not truthful. Accordingly, Smith fails to show that his appellate counsel's performance was deficient on this basis or that he was prejudiced as a result.

In his brief to this Court, Mr. Smith argues that exclusion of the recording was not harmless because it prevented him from presenting the prior inconsistent statements of Lt. Johnson. (ECF # 20 at PageID 2926). He focuses on the fact that Lt. Johnson lied to Ms. Tolliver in telling her that Mr. Smith "hoped she was dead," when Mr. Smith never made such a statement. (*Id.*). In its last reasoned decision, the Eleventh District rejected Mr. Smith's argument that appellate counsel was deficient because trial counsel was able to elicit testimony from Lt. Johnson on cross-examination that his statement to Ms. Tolliver, that Mr. Smith "hoped she was dead," was not truthful. (ECF #7-1 at PageID 645).

The relevant cross examination reads in part as follows:

Q:      Did you tell her that he's hoping you're dead?

A:      Yes, I did.

40

Q:      He never said that, did he?

A:      No, sir.

Q:      That's a lie?

A:      He did not say that. But I said that.

(*Id.* at PageID 608-09). Even without the recording, trial counsel challenged Lt. Johnson's credibility using that exact statement. It would make sense, then, that appellate counsel would not include this as an issue on appeal, because the jury understood Lt. Johnson had lied to Ms. Tolliver and could assess the remainder of his testimony with the knowledge that he had lied.

The Eleventh District's analysis was not contrary to nor an unreasonable application of clearly established federal law. The court followed the standard under *Strickland* and concluded that because same evidence was admitted in a different form, Mr. Smith could not have been prejudiced by its omission. I recommend Ground Three be **DENIED**.

## B.      Ground Four

In Ground Four, Mr. Smith argues he was denied the effective assistance of appellate counsel when counsel

> failed to properly present and argue the denial of a fair and impartial trial and the denial of due process when the trial court instructed prosecutor to object to impeachment material related to the critical testimony of state witness Lt. Johnson.

(ECF #1 at PageID 10). Here, Mr. Smith is referring to a conversation between counsel and the trial judge during the cross examination of Lt. Johnson:

Mr. Lager:      Permission to play the recording, Judge?

The Court:      Of what?

Mr. Lager:      Of the interview between Detective Johnson and David Smith.

The Court:      Counsel approach.

41

(Whereupon, a side-bar discussion was held out of the hearing of the Jury as follows:)

The Court:       You're not objecting?

Mr. Buchanan: I don't know if it can get any worse, it can only get better based on what he's already asked him. Maybe the interview itself would put it in context and he would appear to be a human being.

* * *

Mr. Buchanan: On the grounds of prudence, I'm going to object.

The Court:       Can you cross-examine him and then—

Mr. Lager:       I just did.

Mr. Buchanan: I mean, he's pretty much cherry picked everything out of there that's bad. I don't know what else he can get out of it by playing the redacted tape.

Mr. Lager:       Hear this, Tom. He doesn't know that he's recorded.

The Court:       Well, he's allowed to be recorded without him knowing it.

Mr. Lager:       Yes.

The Court:       I'm not going to let you play it without having heard it.

(ECF #7-1, PageID 546-48).

It is not clear from his brief what error Mr. Smith believes should have been raised by appellate counsel based on this exchange. He explains:

> The trial court stated to the prosecutor "you're not objecting." The comment triggered the State to object. The state admitted it had the reacted copy of the recording at issue. The judge stated she did not want a mistrial; the evidence was redacted.

> The reasoning for the 11th District denying the issue was due to the claim that an adequate cross-examination of Lt. Johnson occurred. The redacted copy of the recording was provided to the prosecution, who never reviewed it. This had nothing to do with the defense. This was not inadmissible evidence from being injected into the trial as the trial court's only reason for denying it was the court did not want a mistrial.

42

(ECF # 20 at PageID 2931) (cleaned up). Mr. Smith then goes on to summarize the law relating to a judge's duty to maintain an appearance of impartiality during trial. (*Id.*). The Eleventh District rejected the argument, emphasizing the conversation took place outside the jury's hearing. (ECF #7-1, PageID 646).

The Eleventh District's rejection of this claim was not contrary to nor an unreasonable application of clearly established federal law. The trial transcript confirms this conversation was held at sidebar, outside the jury's hearing, which the Eleventh District properly concluded was insufficient to show the denial of a fair trial. (ECF #7-1, PageID 616). Although Mr. Smith claims the recording would not have been omitted had the court not "influenced" the prosecutor to object, the Eleventh District noted the same evidence was allowed on cross-examination. (*Id.*). Thus, it concluded Mr. Smith cannot be prejudiced by its omission.

For these reasons, the decision to omit the argument on appeal cannot be said to be "an unreasonable one which only an incompetent attorney would adopt." *Mapes*, 171 F.3d 427-28. In fact, arguing it likely would have detracted from the overall strength of Mr. Smith's appeal. The Eleventh District acted in congruence with *Strickland* in reaching such a conclusion.

I therefore recommend Ground Four be **DENIED**.

## C.    Ground Five

In Ground Five, Mr. Smith argues he was denied effective assistance of appellate counsel "based on the failure to raise ineffective assistance of trial counsel for the state to allow Lt. Johnson to testify to cell tower evidence and guilt of Petitioner." (ECF #1 at PageID 12). Specifically, Mr. Smith argues that the court allowed Lt. Johnson to testify to cell tower evidence and give an improper expert opinion. (*Id.*).

First, it does not appear that Lt. Johnson testified as an expert witness when referring to the cell phone tower data. Rather, he explained he created a map using Google Earth to show the residence of Ms. Tolliver in comparison to the locations of the cell phone towers that registered to Mr. Smith's cell phone at the pertinent times; how he reviewed the data provided to him by cell phone carriers and how he used the data in his investigation; that a T-Mobile employee, Beth Dailey, created the cell site mapping; and that he used it to confirm his suspicion that Mr. Smith had somehow been involved with the attack given the 80+ text messages leading up to the incident. (*See* ECF #7-1 at PageID 587-600). Based on these facts, the Eleventh District concluded that, to the extent Lt. Johnson restated the cell data information in his testimony, it was to explain the course of his investigation, which was already before the jury. (*Id.* at PageID 621). The court explained that testimony relaying cellular location information does not require an expert anyway because the witness is only relaying factual information. *Id.*

Second, even if Lt. Johnson had improperly given an expert opinion regarding the cell phone tower data, Mr. Smith has not shown, nor does the record show, that admission of the opinion was so obviously prejudicial that appellate counsel's failure to raise the issue on direct appeal violated Mr. Smith's Sixth Amendment right to representation. On the contrary, trial counsel cross-examined on the qualification issue and assisted the jury in deciding what weight to place on Lt. Johnson's knowledge of cell phone tower data. In that cross examination, defense counsel established that Lt. Johnson had no professional or educational background that would qualify him to testify to how cell towers collect data and how accurate that data is. (ECF #7-1 at PageID 600, 604-05).

44

Admission of Lt. Johnson's testimony was not a "significant and obvious" error; there was no authority to support the argument his testimony was that of an expert; such an argument was not "clearly stronger" than the issues raised on appeal; the scope of Lt. Johnson's testimony was objected to at trial;[1] and it is clear that appellate counsel had a firm grasp of the record evidence in determining that Lt. Johnson had not prejudicially testified as an expert for purposes of identifying issues for appeal. *Mapes I*, 171 F.3d 427-28. The decision to omit the issue of Lt. Johnson's cell tower testimony cannot be said to be "an unreasonable one which only an incompetent attorney would adopt." *Id.*

Therefore, the Eleventh District's analysis was neither contrary to clearly established law nor an unreasonable application of the law in light of the evidence. The Eleventh District reviewed Lt. Johnson's testimony and analyzed appellate counsel's decision to omit the argument under *Strickland*, concluding that Mr. Smith was not denied effective assistance of appellate counsel. (ECF #7-1 at PageID 621). I thus recommend Ground Five be **DENIED**.

## CERTIFICATE OF APPEALABILITY

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *Rules Governing § 2254 Cases*, Rule 11(a). When a district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claims, a COA should issue, and an

---

[1]    The State asked Lt. Johnson on direct examination if he "had a chance to analyze the data that was obtained from Beth Dailey on the cell phones of [Mr. Smith] and determine the accuracy of that," to which defense counsel objected on grounds that the question called for testimony beyond the competence of the witness. The Court sustained and the question was stricken. (ECF #7-1, PageID 592).

appeal of the district court's order may be taken, if petitioner shows that jurists of reason would find it debatable whether petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude that the district court erred in dismissing the petition or that the petition should be allowed to proceed further. In such a circumstance, no appeal would be warranted. *Id.*

As to the first portion of Ground One, I find the claim is not cognizable, and therefore Mr. Smith has failed to make a substantial showing of the denial of a constitutional right as required by § 2253(c)(2). As to the remaining portion of Ground One as well as Grounds Six and Seven, no reasonable jurist would find it debatable that the claims raised are procedurally defaulted. *See Grayson v. Grayson*, 185 F. Supp. 2d 747, 753 (E.D. Mich. Jan. 3, 2002).  Grounds Three, Four, and Five do not have basis in fact or law to suggest that Mr. Smith has made a substantial showing of denial of a constitutional right to counsel. Therefore, I recommend the District Court deny a COA as to Grounds One, Three, Four, Five, Six, and Seven.

As for Ground Two, I believe Mr. Smith has made a substantial showing of the denial of a constitutional right regarding the identification evidence pursuant to 28 U.S.C. § 2253(c)(2). Therefore, I recommend he be granted a COA regarding that issue only.

46

CONCLUSION AND RECOMMENDATION

Mr. Smith's Ground One is partially non-cognizable. Its remainder, alongside Grounds Six and Seven, are procedurally defaulted. Grounds Two, Three, Four, and Five are meritless.

For the foregoing reasons, I recommend Mr. Smith's habeas petition be **DISMISSED** in its entirety. I also recommend the District Court **GRANT** a certificate of appealability limited to Ground Two only. I recommend the District Court **DENY** a certificate of appealability for Grounds One, Three, Four, Five, Six, and Seven.

Dated: January 11, 2023

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green,* **No. 1:17-CV-00186, 2018 WL 3018175, at \*2 (W.D. Ky. June 15, 2018) (quoting** *Howard,* **932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the**

interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).